IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| GILBERT P. HYATT,<br><br>      Plaintiff,<br><br>v.<br><br>COKE MORGAN STEWART, Acting Under Secretary of Commerce for Intellectual Property and Acting Director of the United States Patent and Trademark Office,<br><br>      Defendant. | Civil Action No. 1:25-cv-01002 |

## COMPLAINT

Plaintiff Gilbert P. Hyatt, by and through his attorneys Baker & Hostetler LLP, alleges as follows:

### Nature of the Action

1. This is an action under the Patent Act, 35 U.S.C. § 145, to obtain a patent on patent application serial number 08/457,360 (Dkt. #705). For over two decades, Plaintiff Gilbert P. Hyatt has diligently prosecuted the '360 Application in the U.S. Patent and Trademark Office ("PTO"), as well as several hundred co-pending applications.

2. Congress has provided a cause of action for an aggrieved patent applicant to bring a civil action under 35 U.S.C. § 145 to obtain *de novo* consideration of his entitlement to a patent. Mr. Hyatt brings this action to obtain a patent in this application.

### Parties

3. Plaintiff Gilbert P. Hyatt is an engineer, scientist, and inventor who has obtained more than 70 issued patents. Some of his patents and applications cover microcomputer structure, computer memory architecture, incremental processing,

illumination devices, display devices, graphics systems, image processing, and sound and speech processing. He is 87 years of age and resides in Clark County, Nevada.

4. Defendant Coke Morgan Stewart is the Acting Under Secretary of Commerce for Intellectual Property and Acting Director of the United States Patent and Trademark Office. She has overall responsibility for the administration and operation of the PTO, including the patent examination process. She is named as a defendant in her official capacity only.

## Jurisdiction and Venue

5. This action arises under the patent laws of the United States. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 35 U.S.C. § 145.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) and 35 U.S.C. § 145.

7. This Complaint is timely filed in accordance with 35 U.S.C. § 145 and 37 C.F.R. § 90.3(a)(3)(i).

8. This matter has not been appealed to the United States Court of Appeals for the Federal Circuit.

## The '360 Application

9. Mr. Hyatt is the owner and inventor of U.S. Patent Application Serial No. 08/457,360 (Dkt. #705) (the "'360 Application").

10. The '360 Application has the benefit of the filing date of U.S. Patent Application Serial No. 06/663,094 (Dkt. #303) filed on October 19, 1984.

11. The '360 Application includes the following 281 claims: 119, 121–123, 127, 129, 131, 134–146, 148–161, 163–167, 170–172, 174–176, 178–193, 195–202, 204–211, 213, 214, 216–251, 253–261, 264–268, 270–274, 276, 278–280, 282–285, 287–292, 294, 295, 297–300, 303, 304, 307–313, 317–319, 321–328, 331, 332, 335, 336, 339–344, 346–352, 354–380, 382–385, 387–396, 398–402, 404, 407–416, 418–420, 422–424, 437–462, and 464 (the "Subject Claims").

12. Mr. Hyatt is seeking issuance of a patent on the Subject Claims, but not on any other claims in the '360 Application.

13. The Subject Claims in the '360 Application are generally directed to the following subject matter:

  a. outputting information to an output communication link, performing a specified control operation, and providing artificial intelligence processing, all of which are based on shaded kernel filtered information that is based on rotated and translated information that is in turn based on all of database information accessed with relational management, information received from an input communication link, received navigation information, and received video camera, infrared, or radar information;

  b. outputting information to an output communication link, controlling a robot, and providing artificial intelligence processing, all of which are based on kernel filtered information that is based on all of database information accessed with relational management, information received from an input communication link, navigation information, and received video camera information, but without recitation of rotating or welding;

  c. displaying a rotating image simulating or representing an operator roaming or moving through a rotating 3D environment based on combined, transformed, or reconstructed video image information that is in turn based on transform processing accessed database information and video image information from first, second, and third video sources, but without recitation of a second memory or a studio environment;

  d. outputting data compressed information to a data link based on combined, transformed, or reconstructed video image information that is in turn based on transform processing accessed database information and video image

3

   information from first, second, and third video sources, but without recitation of artificial intelligence, radial scanning, or polar coordinate scanning;

  e. writing data compressed information into a memory based on combined, transformed, or reconstructed video image information that is in turn based on transform processing accessed database information and video image information from first, second, and third video sources, but without recitation of kernel filtering, radial scanning, polar coordinate scanning, or first, second, and third dimensional address information; or

  f. displaying a rotating 3D perspective report, encyclopedia, or technical document image based on shaded kernel filtering rotated 3D perspective image information, which is in turn based on transformation processing both received inertial information and report, encyclopedia, or technical document information accessed from memory by a relational database management capability, and outputting communication information to a communication link based on the report, encyclopedia, or technical document information accessed from the memory.

These lines of demarcation are further evidenced by the specific limitations of each Subject Claim. Each claim of the Subject Claims of the instant application has ascertainable differences in scope from the claims of Mr. Hyatt's co-pending applications.

  14. Mr. Hyatt filed the '360 Application on June 1, 1995. As such, this application is governed by the Transitional Rules under the Uruguay Round Agreements Act, Public Law No. 103-465 (1994) ("URAA"), including a provision the PTO implemented in 37 C.F.R. § 1.129(a) ("Rule 129(a)"), that limits to two the number of submissions that an applicant can file, to require limited further examination.

  15. The '360 Application is deemed "special" under the PTO rules and must be "advanced out of turn." 37 C.F.R. § 1.102(a). It "continue[s] to be special throughout its

entire course of prosecution in the [PTO], including appeal, if any, to the [Board]." MPEP § 708.01.

16. Mr. Hyatt has never made a dilatory filing in prosecuting the '360 Application. In contrast, the PTO suspended prosecution on at least four occasions (7/31/2002, 1/31/2003, 8/18/2003, and 9/27/2011), and entered new grounds of rejections at least as late as May 2020.

17. The PTO subjected all of Mr. Hyatt's applications, including the instant application, to the Sensitive Application Warning System ("SAWS"), from at least the late 1990s through 2015. In accordance with the terms of the SAWS, examiners lacked authority to allow Mr. Hyatt's patent applications. Moreover, under the terms of the SAWS, examiners and other PTO officials were directed to consider factors that are irrelevant to the statutory criteria for patentability in determining whether or not to permit Mr. Hyatt's applications to issue as patents. The inclusion of Mr. Hyatt's applications in the SAWS prejudiced the PTO in its consideration of Mr. Hyatt's applications, including the instant application.

18. In August 1995, Mr. Hyatt filed a preliminary amendment.

19. In September 1995, the PTO sent a non-final office action rejecting all claims.

20. In March 1996, Mr. Hyatt timely responded.

21. In July 1996, the PTO sent a final office action rejecting all claims.

22. In December 1996, Mr. Hyatt filed a notice of appeal; in April 1997, Mr. Hyatt made a submission under Rule 129(a) removing the finality of the office action; and in August and December 1997, Mr. Hyatt filed supplemental amendments.

23. For the next nearly two years, the PTO did not take any action on the merits. In March 1999, the PTO sent a non-final office action rejecting all claims.

24. In September 1999, Mr. Hyatt timely responded, and in March 2000, Mr. Hyatt filed a supplemental amendment.

25. In October 2000, the PTO sent a final office action rejecting all claims.

26. In April 2001, Mr. Hyatt filed a notice of appeal; in October 2001, Mr. Hyatt made another submission under Rule 129(a) removing the finality of the office action; and in January 2002 and July 2003, Mr. Hyatt filed supplemental amendments.

27. For three years after the Rule 129(a) submission, the PTO did not take any action on the merits and instead entered three suspensions of actions. In October 2004, the PTO sent a non-final office action rejecting all claims.

28. In March 2005, Mr. Hyatt timely responded.

29. In July 2005, the PTO sent a final office action rejecting all claims.

30. In December 2005, Mr. Hyatt filed a notice of appeal, and in May 2006, Mr. Hyatt had an interview with the patent examiner, who agreed to reopen prosecution to correct an error in the previous office action.

31. The PTO did not take any action on the merits for nearly seven and a half years after Mr. Hyatt's interview with the patent examiner. Instead, the PTO suspended examination once and did not decide Mr. Hyatt's repeated petitions for action.

32. In October 2013, the PTO sent a so-called "Requirement" action that, among other things, purported to require Mr. Hyatt to select 600 claims for examination in applications of the "700 Family" (each of which have the same disclosure as the disclosure in the '360 Application) and to identify any earlier embodiment that falls within the scope of any selected claim that Mr. Hyatt believed was entitled to a priority date earlier than December 22, 1988, or to provide a simple statement that the claim was described in the written description of parent application Serial No. 07/289,355 (Dkt. #321), filed on that date, excluding documents incorporated by reference.

33. In late 2013, the PTO sent similar Requirements in nearly all of Mr. Hyatt's applications.

34. In January 2014, Mr. Hyatt timely responded to the Requirement.

35. For a further period, this time more than a year and a half, the PTO did not take any action on the merits. In November 2015, the PTO sent a non-final office action

rejecting all claims. The PTO acknowledged that Mr. Hyatt's response was "bona fide" and "fully responsive."

36. In May 2016, Mr. Hyatt timely responded.

37. For a period of more than two years, the PTO did not take any action on the merits. In August 2018, the PTO sent a non-final office action rejecting all claims.

38. In February 2019, Mr. Hyatt timely responded.

39. For more than a year, the PTO did not take any action on the merits. In May 2020, the PTO sent a final office action rejecting all claims.

40. In October 2020, Mr. Hyatt filed a notice of appeal, and in April 2021, Mr. Hyatt filed an appeal brief and a claim-cancellation amendment, which the PTO entered in May 2022.

41. For more than a year after the appeal brief, the PTO did not take any action on the merits. In June 2022, the PTO sent an examiner's answer.

42. The PTO's failure to send an examiner's answer within six months violated the commitment it made to this Court in *Hyatt v. PTO*, No. 14-cv-01300-TSE-TCB, ECF 156 (E.D. Va.).

43. In November 2022, Mr. Hyatt timely filed a reply brief.

44. The PTO did not take any action on the merits for another period, this time nearly two and a half years. On April 16, 2025, the Board sent its decision affirming the rejections of each of the Subject Claims on at least one ground of rejection.

45. *De novo* consideration of Mr. Hyatt's entitlement to a patent on the '360 Application is uniquely necessary due to the PTO's decades-long campaign to prevent Mr. Hyatt from obtaining further patents on his inventions. Beginning in the mid-1990s, when PTO pulled several of Hyatt's applications from issuance, PTO has engaged in concerted action to prevent any of Hyatt's applications from issuing as patents. PTO placed Hyatt's applications into the SAWS program to prevent the mailing of a notice of allowance even where an examiner wished to allow Hyatt's applications. Where Hyatt prevailed before the

Patent Board, PTO "recycled" his applications by reopening prosecution after he prevailed before the Board. PTO then began to thwart Patent Board review altogether by placing Hyatt's applications in an administrative purgatory that one federal judge referred to as "never-never land." During this time, PTO misrepresented its intent to act on Mr. Hyatt's applications to at least one federal court. Aspects of that campaign have been attested to in sworn testimony by officials who personally interfered with the examination, issuance, and appeal of Hyatt's applications.

46. Ultimately, after nearly two decades of prosecution, PTO threw out all prior activity and began prosecution anew with the goal of rejecting or forcing Hyatt's applications into abandonment. During this time, the very examiners who were supposed to be impartially examining his applications were creating disrespectful "memes" about him that mirrored the language in the PTO's office actions and were sending emails disparaging his personal character. Meanwhile, PTO management instructed examiners to reject submissions Hyatt had not even made and, within three years of resuming examination, informed a federal court that PTO intended to reject all of Mr. Hyatt's applications. And PTO did, rejecting every claim in every application that the Office had not forced into abandonment, irrespective of the actual merits of the applications.

47. For these reasons, among others, PTO acted in bad faith and prejudiced the proceedings underlying the '360 Application.

## The Written Description Rejections

48. The PTO rejected Subject Claims 135, 171, 193, 217, 259, and 322 for alleged lack of written description within the meaning of pre-AIA 35 U.S.C. § 112, first paragraph.

49. The disclosure of the '360 Application describes the claimed subject matter of Subject Claims 135, 171, 193, 217, 259, and 322 in such manner that a person of ordinary skill in the relevant field of art would understand that Mr. Hyatt had possession of the invention claimed in that Subject Claim as of the '360 Application's effective filing date.

50. The rejections of Subject Claims 135, 171, 193, 217, 259, and 322 under pre-AIA 35 U.S.C. § 112, for alleged lack of written description under pre-AIA 35 U.S.C. § 112, first paragraph, are erroneous.

### The Prosecution Laches Rejection

51. The PTO rejected the Subject Claims and held the '360 Application entirely forfeited under the equitable doctrine of prosecution laches.

52. The rejection for prosecution laches is erroneous.

53. The prosecution laches rejection is erroneous because prosecution laches is not a valid ground of rejection under the Patent Act, particularly for the '360 Application, which is subject to the two-submission limit of the URAA Transitional Rules.

54. The prosecution laches rejection is erroneous because Mr. Hyatt did not delay prosecution.

55. The prosecution laches rejection is erroneous because any delay in the prosecution is attributable to the actions or inaction of the PTO.

56. The prosecution laches rejection is erroneous because any delay in prosecution fairly attributed to Mr. Hyatt is not unreasonable and not unexplained.

57. The prosecution laches rejection is erroneous because Mr. Hyatt's prosecution actions did not constitute an egregious misuse of the statutory patent system.

58. The prosecution laches rejection is erroneous because the PTO failed to warn Mr. Hyatt in advance of any specific actions or inaction of the risk of forfeiture of his rights under the Patent Act in or as to the '360 Application and failed to warn Mr. Hyatt of what specific actions he should take or not take to avoid forfeiture.

59. The prosecution laches rejection is erroneous because the PTO failed to make a sufficient showing of intervening rights.

60. The prosecution laches rejection is erroneous because the PTO unreasonably delayed in asserting prosecution laches after decades of prosecution activity by Mr. Hyatt,

prejudicing Mr. Hyatt, who has invested significant amounts of time and money in the prosecution of the '360 Application.

61. The prosecution laches rejection is erroneous because the PTO has unclean hands.

### The Undue Multiplicity Rejections

62. The PTO rejected all of the Subject Claims under pre-AIA 35 U.S.C. § 112, second paragraph, as allegedly failing to distinctly claim the subject matter that Mr. Hyatt regards as the invention under the doctrine of undue multiplicity.

63. Each of the Subject Claims informs with reasonable certainty about the scope of each claim.

64. Each of the Subject Claims distinctly claims the subject matter that Mr. Hyatt regards as the invention.

65. The Subject Claims are distinguished from all claims that Mr. Hyatt seeks to pursue in all of his other applications because each of the Subject Claims are generally directed to the subject matter identified in paragraph 13 above, whereas Mr. Hyatt does not seek to patent any claims that meet the same descriptions in any other of his applications. Each of the Subject Claims contains further specific limitations. Each of the Subject Claims has ascertainable differences in scope from the claims of Mr. Hyatt's co-pending applications. Each of the Subject Claims of the '360 Application has ascertainable differences in scope from each other.

66. The rejection of the Subject Claims as unduly multiplied under pre-AIA 35 U.S.C. § 112, second paragraph, is erroneous.

### The Obviousness Rejections

67. The PTO rejected certain of the Subject Claims under pre-AIA 35 U.S.C. § 103 as allegedly being obvious over certain references.

68. The PTO rejected Subject Claims 135, 193, 217, and 259 as obvious over Kroczynski (U.S. Patent No. 4,565,487), Zwirn (U.S. Patent No. 4,532,548), and Southgate (U.S. Patent No. 4,282,511).

69. The PTO rejected Subject Claims 171 and 322 as obvious over Kroczynski and Southgate.

70. Subject Claims 135, 171, 193, 217, 259, and 322 would not have been obvious to a person having ordinary skill in the relevant field of art as of the effective filing date of the '360 Application, from the above-identified references or their combinations.

71. The rejections under pre-AIA 35 U.S.C. § 103 are erroneous.

## **Objections**

72. In addition to rejecting the Subject Claims, the PTO has objected to the drawings.

73. All objections to the drawings, and any objections to the specification, are erroneous because the specification and drawings comply with the requirements of law.

## **Count I: Issuance of a Patent**

74. The above paragraphs are hereby incorporated by reference as if set forth fully herein.

75. Patent Act Section 145 provides a cause of action for a patent applicant dissatisfied with a decision of the Patent Trial and Appeal Board to obtain a judgment that the "applicant is entitled to receive a patent for his invention, as specified in any of his claims involved in the decision of the Patent Trial and Appeal Board." 35 U.S.C. § 145.

76. Each of the Subject Claims of the '360 Application was involved in the April 16, 2025, decision of the Patent Trial and Appeal Board.

77. Each of the Subject Claims of the '360 Application is patentable.

78. Each of the Subject Claims of the '360 Application satisfies all applicable legal requirements for issuance of a patent.

79. Mr. Hyatt is entitled to receive a patent on the Subject Claims in the '360 Application.

### **Prayer for Relief**

WHEREFORE, Plaintiff respectfully asks that this Court enter Judgment in his favor and that he be granted the following relief:

A. A decree that Mr. Hyatt is entitled to receive a patent for the '360 Application on the Subject Claims;

B. A decree that the rejections of the Subject Claims of the '360 Application are erroneous;

C. A decree authorizing the Director of the United States Patent and Trademark Office to issue a patent for the subject matter claimed in the Subject Claims of the '360 Application;

D. A decree that the specification and drawings of the '360 Application comply with the requirements of law; and

E. Such other and further relief as the Court may deem just and proper.

Dated: June 13, 2025

Respectfully submitted,

/s/ Mark W. DeLaquil
MARK W. DELAQUIL (VA Bar No. 68088)
ANDREW M. GROSSMAN*
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
(202) 861-1527
agrossman@bakerlaw.com
mdelaquil@bakerlaw.com

*Attorneys for Gilbert P. Hyatt*

* Application for admission *pro hac vice* forthcoming